**IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>**

|  |  |  |
|---|---|---|
| | * | |
| **USAA CASUALTY INSURANCE, CO.** | * | |
| **a/s/o BETINA FLETCHER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No. MJM-23-291** |
| **v.** | * | |
| | * | |
| **PRO RINSE POWER WASH, LLC,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM**</u>

This matter is before the Court on USAA Casualty Insurance, Co.'s ("USAA" or "Plaintiff") Motion to Preclude Testimony of John Tobias and Pro Rinse Power Wash's ("Pro Rinse" or "Defendant") Motion for Summary Judgment. The motions are ripe for disposition, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall deny the motions.

**I. RELEVANT FACTUAL BACKGROUND**

On June 21, 2022, a fire occurred at a residence in Perry Hall, Baltimore County, Maryland owned by Betina Fletcher ("the subject property"). ECF 35-2 (Willson Report) at 2; ECF 35-3 (Wald Report) at 1. Fletcher had a home insurance policy with USAA, which had been insuring the subject property for "about [seventeen] years." ECF 36-6 (Fletcher Dep.) at 48:5–15.

In 2019, Chase Remodeling, then known as Insulators Home Exteriors, installed new exterior ground fault circuit interrupter ("GFCI")[1] outlets on the subject property. ECF 36-12 (Chase Contract); ECF 36-11 (Chase Dep.) at 16:14–18:6. Robert Chase, the company's owner, testified that while his team changed the outlet receptable, they did not install new wiring. Chase Dep. at 18:6–18. Chase also admitted that no electrician was present when installing the GFCI outlet.[2] *Id.* at 22:14–23:8, 38:8–39:13.

The morning of the fire, Fletcher hired Jordan Kunkel, the owner and sole employee of Pro Rinse, to power wash the exterior of the subject property. Wald Report at 1; ECF 36-7 (Kunkel Aff.), ¶ 2. Kunkel founded Pro Rinse in 2020 and has power washed hundreds of homes. *Id.* ¶ 4; ECF 36-5 (Kunkel Dep.) at 7:14–19. Before starting Pro Rinse, Kunkel worked at Maryland Power Wash from 2015 to 2017, where he received roughly two years of on-the-job training. Kunkel Dep. at 13:16–14:9; 17:10–18:7. Kunkel testified that he had never read any books or manuals in connection with power washing, *id.* at 19:6–16, nor any manuals or literature in connection about vinyl siding, *id.* at 55:16–20. He also testified that he had never seen or heard any information that power washing a home could cause a fire. Kunkel Aff. ¶ 4. Kunkel washes homes with a cleaning compound made up of four gallons of water and one gallon of 12.5% sodium hypochlorite bleach,

---

[1]     The Court in *Leviton Manufacturing Co. v. Universal Security. Instruments, Inc.* gives a primer on GFCIs:

> [A GFCI is] a type of electrical outlet that protects a consumer from electric shock when an electrical device is connected to a power source and a ground fault occurs. A ground fault occurs when a separate current path is created in addition to the current flowing from the electrical power source through the electrical device and back to the power source. This may happen, for example, due to wear and tear of the electrical device, or when the electrical device becomes wet.

409 F. Supp. 2d 643, 646 n.1 (D. Md. 2006).

[2]     Defendant contends that this is a violation of the Baltimore County Code, which only authorizes licensed electricians to perform such installation. *See* Balt. County Code § 21-7-202, ECF 36-13.

and then wipes off the compound with Mr. Clean brand mop soap. Kunkel Dep. at 40:2–41:21, 63:3–21.

Kunkel and Fletcher agreed that Kunkel would power wash the subject property for $200, which he was paid electronically on June 21, 2022. Kunkel Aff. ¶ 2. Kunkel testified that he did not take any precautions before power washing the subject property, and despite knowing that most homes have exterior electrical outlets, he did not check whether the subject property had any exterior electrical outlets. Kunkel Dep. at 35:12–36:3; 49:1–5. Kunkel took his pressure washer out from the back of his pick-up truck, hooked it up to the hoses, power washed the subject property, and then left. *Id.* at 34:1–35:11. This process took Kunkel about an hour. *Id.* at 32:14–20.

The fire occurred roughly twenty to twenty-five minutes later, at 11:51 a.m. ECF 35-1 (Tobias Report) at 1; ECF 35-2 (Willson Report) at 9.

Plaintiff and Defendant hired electrical engineers to assist in determining the cause of the fire. Plaintiff's expert, Michael Wald, concluded that the fire occurred because Kunkel sprayed water onto an external GFCI outlet on the west side of the house without properly covering it. Wald Report at 2. Defendant's expert, Andrew Willson, concluded that the fire was caused by the failure of a component of electrical system in the area of the exterior outlet. Willson Report at 9. John Tobias, another electrical engineer hired by Defendant, concluded that the GFCI outlet had been incorrectly installed at the time of the fire, making it susceptible to the elements. Tobias Report at 6–7. Although the chlorine solution that Kunkel sprayed onto the subject property likely contributed to the ignition, Tobias opined that the fire would not have occurred had the outlet been properly installed, that the outlet had likely already been "subject to years of moisture intrusion" since its 2019 installation, and that it likely would have eventually caught fire on its own. *Id.* at 6.

Plaintiff also hired Ramon Burke, a professional power washer, to offer an expert opinion as to the standard of care that applies to professional power washing services and whether Pro Rinse complied with that standard. *See* ECF 37-4 (Burke Aff.). Burke concluded that Pro Rinse breached a standard of care in failing to cover electrical outlets before power washing the subject property; in washing the vinyl siding at an upward angle, which can cause moisture to get trapped in the siding; in failing to familiarize himself with the nature of vinyl siding; and with power washing the home in too brief a time period. ECF 36-4 (Burke Report) at 1–4.

## II.      RELEVANT PROCEDURAL HISTORY

On February 2, 2023, Plaintiff filed its initial Complaint against Defendant, asserting claims in subrogation for negligence (Count I), breach of contract (Count II), and breach of warranties (Count III). ECF 1. On March 31, 2023, Plaintiff filed an Amended Complaint, ECF 13, and on April 21, 2023, Defendant filed an Answer to the Amended Complaint. ECF 14. Plaintiff demands a jury trial. Am. Compl. at 1. The parties entered discovery on April 24, 2023, ECF 16, and completed discovery in January 2024, ECF 30, 31, & 33.

On March 1, 2024, Plaintiff filed a Motion to Preclude Testimony of John Tobias, ECF 35, and Defendant filed a Motion for Summary Judgment, ECF 36. On April 1, 2024, the parties filed their respective oppositions to each other's motions, ECF 37 & 38, and on April 15, 2024, each party filed a reply in support of its motion, ECF 39 & 40.

## III.     PLAINTIFF'S MOTION TO PRECLUDE EXPERT TESTIMONY

### A.  Standard of Review

District courts are tasked with making preliminary determinations as to the qualifications of experts and the relevance and reliability of their testimony. *See* Fed. R. Evid. 104(a) & 702; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *Kumho Tire v. Carmichael*, 526 U.S.

137, 141 (1999); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229–30 (4th Cir. 2017). Courts act as

gatekeepers "to protect the judicial process from 'the potential pitfalls of junk science,'" *Sardis v.

Overhead Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (quoting *United States v. Bonner*, 648

F.3d 209, 215 (4th Cir. 2011)), and are given wide latitude in this role. *See Kumho Tire*, 526 U.S.

at 141.

The party seeking to admit expert testimony bears the burden of establishing admissibility

by a preponderance of the evidence. *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F.

Supp. 2d 549, 553 (D. Md. 2011). Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if the proponent demonstrates to the court that
> it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert's opinion reflects a reliable application of the
> principles and methods to the facts of the case.

The Supreme Court has identified a non-exhaustive list of guideposts to be considered in a

*Daubert* analysis, including:

> (1) whether the particular scientific theory has been or can be tested;
> (2) whether the theory has been subjected to peer review and
> publication; (3) the known or potential rate of error; (4) whether
> there are standards controlling the method; and (5) whether the
> technique has gained general acceptance in the relevant scientific
> community.

*Lins v. United States*, Civ. No. ELH-17-2163, 2024 WL 1604494, at \*19 (D. Md. Apr. 12, 2024) (citing *Daubert*, 509 U.S. at 593–94). Importantly, the foregoing factors "do *not* constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts . . . . Those factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 138 (citing *Daubert*, 509 U.S. at 591, 593); *see also Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 785 (4th Cir. 1998). "Ultimately, the trial court has discretion to determine whether expert testimony 'has a greater potential to mislead than to enlighten.'" *United States v. Mason*, 662 F. Supp. 3d 548, 553 (D. Md. 2023) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

### B. Analysis

Tobias made the following four conclusions in his report:

a. The subject exterior receptacle cannot be ruled out as the point of origin of the fire at the loss location.[3]

b. The subject exterior receptacle was incorrectly installed, defeating the weatherproof properties of its cover and enclosure.

c. Correct installation of the exterior receptacle would prevented [sic] the fire.

d. Incorrect installation of the subject exterior receptacle defeated the fire/heat containment properties of it's [sic] cover and electrical box assemblies.

Tobias Report at 6–7. Plaintiff moves to exclude Tobias's testimony in the entirety. ECF 35 at 1.

Having reviewed Tobias's report, the Court finds, as a general matter, his findings and conclusions to be based on "scientific methods and practices, review of scene photography,

---

[3]     There is no dispute that the external GFCI outlet was the point of origin of the fire. *See* ECF 35 at 1 ("All experts agree the subject fire started in the exterior electrical receptacle.") (citation omitted).

examination of evidence harvested from the loss location, review of reports of other investigators, [and] testimony," with the assistance of various sources listed in Appendix 3 of his report. Tobias Report at 2. The Court acknowledges that Tobias never personally visited the subject property, ECF 38-2 (Tobias Dep.) at 8:11–13, but has been presented with no evidence to suggest that such a visit was necessary in order for Tobias to form his opinions.

Plaintiff argues that Tobias's opinions should be excluded from trial because (1) his theories are based on the use of an incorrect exemplar outlet and (2) his opinions that the outlet cover was improperly installed and the outlet box was not installed at all are based on unreliable methods. ECF 35 at 8–13. Plaintiff further argues that Tobias's opinion regarding whether the GFCI outlet failed to "trip" should not be admitted both because Defendant failed to disclose it in an expert report, as required by Fed. R. Civ. P. 26(a), and because it does not pass muster under *Daubert*. ECF 39 at 4–6.[4] Finally, Plaintiff asserts that Tobias's opinions, even if reliable, should not be admitted because they would confuse the jury. ECF 35 at 13. For reasons explained below, the Court is not persuaded.

### 1.   Tobias's Opinion Regarding Improperly Installed Outlet Cover

#### a.   Use of Incorrect Exemplar

Tobias states in his report that, after examining the burned remnants, he determined the GFCI outlet receptable to be a Hubbell TAYMAC cover.[5] Tobias Report at 3–4. For purposes of testing, Tobias used a Hubbell TAYMAC MR420C model. Tobias Report, Exhibits 1–2; Tobias

---

[4]      In its reply brief, Plaintiff also argues Defendant improperly asserted that Fletcher had a duty to supervise the contractors and is vicariously liable for their errors. ECF 39 at 8–10. It is not clear to the Court that Defendant actually raised such an argument in its opposition or in any other brief. Further, Plaintiff did not present this issue in its opening brief. The Court declines to consider arguments raised for the first time in a reply. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006)).

[5]      Hubbell TAYMAC appliances contain both electrical covers and boxes. Tobias Dep. at 20:17–23.

Dep. at 30:21–32:24. Tobias compared the long wood screws recovered from the fire to the shorter, electrical-grade screws in the exemplar and determined that the subject GFCI outlet cover, which is designed to keep out water, could not have been properly installed. Tobias Report, Exhibit 1. Tobias admits, however, during his deposition that the GFCI outlet receptable at the subject property was more likely to have been a Hubbell TAYMAC MM420C model, and not the MR420C he tested. Tobias Dep. at 30:21–32:24. Tobias nonetheless asserts that testing a MM420C exemplar would not have changed his conclusions because "[t]he correct installation of the Hubbell Taymac MM420C as per its instructions is virtually the same as for the MR420C." Tobias Aff., ECF 38-1, ¶ 12–14.

There is no indication in the record that Tobias's use of the MR420C rendered his methodology, based on established National Electrical Manufacturers Association ("NEMA") standards, *see* Tobias Report at 4, was unreliable. To the extent Tobias's conclusions are less credible for having used a different model as an exemplar, the mismatch more properly goes to the weight of the evidence, and not whether it is admissible. *See Carlson v. Boston Sci. Corp.*, No. 2:13-CV-05475, 2015 WL 1931311, at *12 (S.D.W.Va. Apr. 28, 2015) ("Any inconsistencies or discrepancies in [an expert's] testimony go to its weight, not its admissibility, and [Plaintiff] is free to capitalize on these matters during cross-examination.") (citing *Daubert*, 509 U.S. at 596).

b.   Use of the Term "Waterproof"

According to Tobias, a properly installed Hubbell TAYMAC cover is rated a "NEMA 3R enclosure " and is thus "waterproof." Tobias Report at 4; Tobias Dep. at 43:2–6.[6] Tobias conceded

---

[6]     NEMA defines Type 3R enclosures as "enclosures constructed for either indoor or outdoor use to provide a degree of protection to personnel against access to hazardous parts; to provide a degree of protection of the equipment inside the enclosure against ingress of solid foreign objects (falling dirt); to provide a degree of protection with respect to harmful effects on the equipment due to the ingress of water (rain, sleet, snow); and that will be undamaged by the external formation of ice on the enclosure." Tobias Dep. at 44: 11–24*; see also* ECF 38-2, at 45.

in his deposition that he did not intend to suggest that a properly installed Hubbell TAYMAC cover is protected against any amount of water, but that it instead affords a "degree" of protection, and "prevent[s] the ingress of water up to a point." *Id.* at 49:10–64:5 (discussing whether terms "weatherproof" (i.e., protected against rain, sleet, and snow) and "watertight" (i.e., constructed so that moisture will not enter the enclosure under specified test conditions) are more accurate terms to describe cover than "waterproof"). Tobias testified that his use of the term "waterproof" in his report should be more properly understood as "watertight." *Id.* at 64:6–11. Any bearing Tobias's use of the term "waterproof" instead of "watertight" has on the validity of his conclusions is a matter for the trier of fact to decide; it is not grounds for exclusion. *See CSX Transp., Inc. v. Spiniello Glob., Inc.*, Civ. No. JKB-19-2976, 2023 WL 5515979, at *18 (D. Md. Aug. 25, 2023) ("Questions regarding the factual underpinnings of the expert witness's opinion affect the weight and credibility of the witness's assessment, not its admissibility.") (cleaned up).

The Court finds Tobias's opinion that the outlet cover was improperly installed to be based on reliable methods and principles.

Even where an expert opinion or expert testimony is premised on sound methodology, the district court retains discretion to exclude it where its probative value is substantially outweighed by the risk of misleading or confusing the jury. *See Mason*, 662 F. Supp. 3d at 553–54 (citing Fed. R. Evid. 403). Here, the probative value of the challenged opinions is significant in that it tends to make it more probable that the proximate cause of the fire was not Pro Rinse's power washing but rather faulty installation of the exterior outlet. The Court does not find the probative value of Tobias's testimony to be substantially outweighed by any risk of confusing or misleading the jury.

Thus, Plaintiff's motion to exclude Tobias's opinions as to improper installation of the outlet will be denied.

### 2. Tobias's Opinion Regarding Absence of Electrical Box

In his report, Tobias determined that the at-issue GFCI outlet was not properly installed in an electrical box that would have contained a fire ignited within it. Tobias Report at 6–7. Plaintiff argues that Tobias should be precluded from testifying at trial that an electrical box was not installed because it is based on speculation and use of an incorrect exemplar. ECF 35 at 11–12. Plaintiff also contends that Tobias failed to test his theory that the fire would have been contained had there been an electrical box. *Id.* at 12–13.

Tobias concluded that no electrical box was present because (1) there was no electrical box recovered from the fire and (2) an electrical box could not attach to the exemplar Hubbell TAYMAC MR420C cover using the type of long wood screws recovered from the fire. Tobias Report at 6–7. Michael Wald, Plaintiff's electrical engineering expert, asserts that "[i]t is quite common for there to be no remains of a plastic outlet box after a fire[,]" and that "[w]hile it is possible some remains of the plastics remained after the fire, the suppression activities [i.e., use of fire hoses] are likely to have washed them away[.]" ECF 35-7 (Wald Letter) at 3. Tobias, in his report, appears to dispute these propositions from Wald, stating, that "[s]ome remains of electrical boxes nearly always survive a fire[.]" Tobias Report at 6. Tobias states in his affidavit that, having conducted "approximately 50 fire investigations a year for at least the past four years, . . . invariably some portion of the box survives in some form except in circumstances where the fire is an inferno[.]" Tobias Aff. ¶ 10. He also points out that "the melted cover and the melted cover frame survived the fire[,]" suggesting that, if one had been present, remains of an electrical box would have also survived. *Id.* Additionally, Tobias notes that the melted remains of other plastic electrical boxes in the same stud bay, and in other parts of the subject property, were recovered. *See* Tobias Report at 5–6; Tobias Dep. at 75:8–77:1, 82:8–83:21; ECF 38-2 at 49. They were

melted but not entirely consumed by the fire. *Id.* The Court finds that Tobias's opinions adequately and reliably rule out the possibility that that any remains of an electronical box were either consumed by the fire or washed away in fire suppression efforts.

Tobias agreed at his deposition, based on the available evidence, that a plastic blue electrical box had been installed prior to 2019, when the contractors installed the new outlet. Tobias Dep. at 26:4–20, 27:14–21. Tobias also testified that it was possible that Chase Remodeling reused the existing box when replacing the outlet. Tobias Dep. at 26:21–27:7. Chase testified at this deposition, on behalf of Chase Remodeling, that the electrical box previously installed would not have been changed when the new outlet was installed in 2019. Chase Dep. at 35:10–16. However, as Defendant points out, Chase's testimony on this point was not based on personal knowledge of the installation of the GFCI outlet at issue. *See* ECF 38-3 (Chase Dep.) at 14:20–15:9. Considering the lack of any direct evidence that an electrical box was installed, and the presence of circumstantial evidence that no electrical box was present, this Court cannot find that Tobias's determination that no electrical box was installed was based on unreliable methods.

Finally, Plaintiff takes issue with Tobias basing his opinions on testing of "an incorrectly identified exemplar receptacle." ECF 35 at 13. But, as explained supra, Tobias nonetheless asserts that testing an exemplar of the same model as the at-issue GFCI outlet would not have changed his conclusions given the similarities between the two models. Tobias Aff. ¶ 12–14. Tobias's use of a different model goes to the weight of his testimony, not its admissibility.

In sum, the Court finds Tobias's opinions challenged in Plaintiff's motion to be based on reliable methods and principles and therefore not subject to exclusion under *Daubert* or Rule 702. Further, the Court does not find, under Fed. R. Evid. 403, that the probative value of Tobias's opinions regarding the absence of an electrical box to be substantially outweighed by any risk of

misleading or confusing the jury. Accordingly, Plaintiff's motion to exclude these opinions will be denied.

### 3. Tobias's GFCI Tripping Opinion

Defendant states in its opposition brief that the GFCI outlet at issue in this case failed to "trip"—that is, cut power when moisture is detected and causes a short circuit. For support, Defendant cites, *inter alia*, Tobias's newly created affidavit, in which Tobias states that the outlet was "supposed to cut power when there is any short" but "did not trip and cut electrical power." Tobias Aff. ¶ 8. In its reply, Plaintiff casts these statements as new opinions not previously disclosed in Tobias's report or reflected in his deposition testimony and, on this basis, asks that they be excluded. ECF 39 at 4–6. Defendant has not sought leave to file a sur-reply or otherwise responded to this argument from Plaintiff.

Rule 26(a)(2)(B)(i) of the Federal Rules of Civil Procedure requires expert witness reports to contain, *inter alia*, "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them." Unless the nondisclosure of an expert opinion is "harmless" or "substantially justified," the expert opinion must be excluded. *See* Fed. R. Civ. P. 37(c)(1). A district court has broad discretion in determining whether the nondisclosure of an expert opinion is harmless or substantially justified. *See Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (citing *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). In deciding whether a failure to disclose was harmless, a court considers "the surprise to the party against whom the [opinion] would be offered, the ability of that party to cure the surprise, the extent to which allowing the [opinion] would disrupt the trial, and the importance of the [opinion]." *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *S. States*, 318 F.3d

at 597). The court considers the party's explanation for its untimely disclosure in determining whether it was substantially justified. *Id.*

Upon review of Tobias's new affidavit and his prior report and deposition testimony, the Court finds that his new statements regarding the GFCI outlet's failure to trip to be related, to some extent, to opinions detailed in his report and discussed at his deposition. At the same time, references in Tobias's affidavit to GFCI's failure to trip and cut power upon detection of moisture or a short circuit do not appear in Tobias's report. Although the Court agrees with Plaintiff that the disclosure of new expert opinions at this late stage would provide ample grounds for exclusion under Rule 37(c)(1), the question of whether and extent to which Tobias's affidavit presents new opinions is not adequately briefed for this Court to grant relief. This issue was first raised in Plaintiff's reply, the filing of sur-replies is generally disfavored in this district, and Defendant has not sought leave to file one.

The Court will deny Plaintiff's pending motion but provide an opportunity for Plaintiff to file a separate motion under Fed. R. Civ. P. 37(c)(1) seeking exclusion of any opinions offered in Tobias's affidavit that it contends were not timely disclosed. A briefing schedule will be set in a separate Order.

## IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

A court may grant a party's summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]"

and a genuine issue as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).

### B. Count I – Negligence

Defendant argues that summary judgment should be granted in its favor as to Plaintiff's negligence claim in Count I because Plaintiff has failed to provide any evidence of a standard of care for power washers. ECF 36-1 at 11–12. Plaintiff, in turn, argues that the testimony of its expert Ray Burke sets out a standard of care such that summary judgment is inappropriate. ECF 37 at 7–8.

To prevail on a claim of negligence under Maryland law, "[a] plaintiff must prove the following: '(1) the defendant owes the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff sustained an injury or loss; and (4) the defendant's breach of the duty was the proximate cause of the plaintiff's injury.'" *Johnson v. Sam's West, Inc.*, Civ. No. ELH-21-2697, 2022 WL 16575706, at *5 (D. Md. Nov. 1, 2022) (citing *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 451 (Md. 2017). The existence of a contract alone

does not provide for a duty of care in tort. *See Titan Custom Cabinets, Inc. v. Truist Bank*, 505 F. Supp. 3d 558, 569, (D. Md. 2020) (citing *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986)). Rather, a professional breaches a duty of care where he renders services without "exercis[ing] the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of Torts § 299A (1965).

"Where the plaintiff alleges negligence by a professional, expert testimony is generally necessary to establish the requisite standard of care owed by the professional." *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1086 (Md. 2010) (citing *Rodriguez v. Clarke*, 926 A.2d 736, 755 (2007)). Indeed, "the plaintiff bears the burden of overcoming the presumption that due skill and care were used." *Id.* (quoting *Crockett v. Crothers*, 285 A.2d 612 614 (Md. 1972)).[7]

That many lay persons may operate their own power washers and power wash their own homes does not defeat the need for expert testimony as to the standard of care for a professional power washing service. *Cf. Osei*, 2021 WL 5416542 (requiring expert testimony to explain standard of care on the use of slip-resistant paint); *Schultz*, 990 A.2d at 1089–90 (requiring expert testimony to explain a bank's standard of care in adding a name to a bank account, notwithstanding that people commonly add names to bank accounts on their own).

---

[7]     Expert testimony is not needed to prove professional negligence where "the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony." *Id.* at 1086–87 (citing *Crockett*, 285 A.2d at 614); *see also Cent. Cab Co. v. Clarke*, 270 A.2d 662, 667 (Md. 1970) (no need for expert testimony as to standard of care where an attorney terminates attorney-client relationship without ever notifying the client or a dentist pulls the wrong tooth of a patient) (citing *McClees v. Cohen*, 148 A. 124 (Md. 1930)).

Here, Plaintiff does not contend that Pro Rinse's conduct was so negligent that expert testimony as to the standard of care is unnecessary, *see* ECF 37, and the Court will not make that argument for Plaintiff, *see Osei v. Cushman & Wakefield*, Civ. No. PX-20-0040, 2021 WL 5416542, at *2 (D. Md. Nov. 19, 2021), *aff'd*, No. 21-2427, 2022 WL 9886710 (4th Cir. Oct. 17, 2022) ("For her part, Osei has not argued that no such standard of care expert testimony is required, which itself suggests that she has conceded the point.").

Plaintiff has proffered the expert testimony of Ray Burke to establish the industry standard of care for professional power washing. Burke Aff. ¶ 4. Burke states that Kunkel's actions violated industry standards of care by failing to inspect the subject property before power washing it, failing to tape exterior outlets, power washing the vinyl siding at an upwards angle, and power washing the home in less than an hour. Burke Report at 1–4.[8]

In the appendix to his report, Burke cites various social media posts and a slide presentation of his own making as support for the existence of a national standard of care for professional power washers. Burke Report, Appendix. For example, Burke cites a November 19, 2020, Facebook post by an individual named "Dougie Do" to support the statement that "[c]ompetent power washing professionals know they must protect [exterior electrical outlets]." Burke Report at 1, Appendix, Citation 1. Burke does not explain who Dougie Do or the other individuals who have authored social media posts are, nor why these particular social media posts should be deemed to be authoritative on the standard of care for professional power washing.

Further, Burke's opinion that Kunkel power washed the subject property too quickly is based on nothing but his own *ipse dixit* and cannot, without more, establish a professional standard of care for professional power washers generally. *See Sardis*, 10 F.4th at 292 (a court must not accept that something is true simply because an expert says so) (citing *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019)).

However, Burke's reliance on cleaning instructions from the top-selling brands of vinyl siding, *see* Burke Report, Appendix, Citation 3.5, is a permissible basis for forming his opinions as to a standard of care. The various sets of instructions for some of the industry's best-selling

---

[8]       Burke also states that another individual with a long history in the power washing industry called and told him that Kunkel's actions were "indefensible," Burke Aff. ¶¶ 19–21, but this statement is inadmissible hearsay, *see* Fed. R. Evid. 801.

products, *see* Burke Report at 2–4, make clear that power washers must avoid washing at an upward angle and must pay special attention to electrical wiring, *see* Burke Report, Appendix, Citation 3.5 (citing five websites providing instructions for the cleaning of vinyl siding).

Accordingly, the Court finds Burke's opinions as to the standard of care for professional power washers to be admissible. Burke may offer opinions that Pro Rinse owed Fletcher a duty of care in power washing her home to avoid spraying at an upward angle and to avoid electrical wiring, outlets, and appliances.

At his deposition, Kunkel testified that he did not take any precautions before power washing the subject property, nor did he observe whether the home had any exterior electrical outlets. Kunkel Dep. at 35:12–36:3; 49:1–5. Further, Kunkel was photographed power washing the vinyl siding at the upward angle. Burke Aff., Ex. C; Kunkel Dep. at 51:3–17. He could not power wash the top of the home at a level angle because he did not bring a ladder; instead, he sprayed the subject property while standing on the deck, Kunkel Dep. at 52:1–10.

Burke's opinion that Kunkel's conduct violated the standard of care for professional power washing creates a genuine dispute of material fact as to whether Defendant was negligent. Defendant's motion for summary judgment on Count I must be denied.

### C.  Count II – Breach of Contract

Defendant argues that it is entitled to summary judgment on Plaintiff's breach of contract claim in Count II because this count is duplicative of Count I for negligence. ECF 36-1 at 17.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001) (citing *Continental Masonry Co., Inc. v. Verdel Const. Co., Inc.*, 369 A.2d 566, 569 (Md. 1977). "The formation of a contract requires

mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (citing *Peer v. First Federal Sav. and Loan Ass'n of Cumberland*, 331 A.2d 299, 301 (Md. 1975)). "[A] contractor is liable for breach of contract when he fails either to perform work which he undertook to do or to perform it with skill and care." *Gaybis v. Palm*, 93 A.2d 269, 272 (Md. 1952). The duty of care is defined in part as "[t]he duty to act with the diligence and prevailing standards for the locality for the kind of work performed . . . ." *Duty of Care and Skill*, BLACK'S LAW DICTIONARY (12th ed. 2024).

The existence of a contract between Fletcher and Pro Rinse, for Pro Rinse to power wash the subject property for $200 on June 21, 2022, is not in dispute. Kunkel Aff. ¶ 2; Fletcher Dep. at 17:1–13.[9] This oral contract was created during a phone call between Fletcher and Kunkel. Fletcher Dep. at 17:1–7 ("So I captured [Jordan Kunkel's] information and I called him and asked him if he had any availability to power wash my house. I live in the same neighborhood. And he said yes.").

Where a defendant performs his contractual obligations but in a dangerous manner, a plaintiff may bring suit under both tort and contract. *See Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1060 (Md. 1999) (differentiating between nonfeasance and misfeasance) (citing cases). Counts I and II are not duplicative. *See Schultz*, 990 A.2d at 1092 n.21 ("There is no contradiction in allowing a party to enforce the duty of ordinary care through a contract claim, a tort claim or both."). And, as with a professional negligence claim, a plaintiff may require expert testimony to

---

[9]     In her deposition, Fletcher stated that Kunkel power washed the subject property on June 22, 2022, but the bulk of the evidence in the record suggests that it occurred on June 21, 2022, as do the parties' briefs.

"establish[] the extent of the obligation that the duty of ordinary care imposed on the [defendant]."
*Id.* at 1091–92.

Here, as discussed *supra*, Burke's opinions present a genuine dispute of material fact as to
the whether Pro Rinse's conduct breached a duty of care. Thus, summary judgment shall be denied
as to Count II.

### D.  Count III – Breach of Warranty

Defendant argues that it should be granted summary judgment as to Plaintiff's breach of
warranty claim in Count III because Plaintiff has not provided any evidence of a warranty. ECF
36-1 at 19.

In Maryland, however, "[t]he obligation to perform work with skill and care is implied by
law and need not be stated in the contract." *Gaybis*, 93 A.2d at 272. "Maryland law acknowledges
the fact that 'an obligation to use ordinary skill and care in constructing a house or performing
other work is implied by law independent of any contract.'" *Great American Assurance Co. v.
Ferguson*, Civ. No. AW-10-0915, 2010 WL 5173714, at *5 (D. Md. Dec. 14, 2010) (quoting
*Worthington Constr. Corp. v. Moore*, 291 A.2d 466, 467 (Md. 1972)). In *Ferguson*, the Court
declined to dismiss a breach of implied warranty claim based on the defendant's failure to install
gas lines in accordance with industry standards. *Id.*

Here too, Plaintiff alleges that Defendant breached an implied warranty by violating
industry standards. Am. Compl. ¶¶ 21–22. Because, unlike *Ferguson*, the instant matter is at the
summary judgment stage, Plaintiff must present evidence in support of its claim, *see Catrett*, 477
U.S. at 324, but the Court finds that Plaintiff meets that burden. As discussed *supra*, the testimony
of Plaintiff's expert Burke provides a standard of care for professional power washers, as well as
a genuine dispute as to whether Pro Rinse fell short of that standard. A trier of fact may thus weigh

Pro Rinse's performance in power washing the subject property against the proffered standard of care to determine whether the implied warranty of ordinary skill and care has been breached.

Accordingly, summary judgment shall be denied as to Count III.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Preclude Testimony of John Tobias (ECF 35) shall be DENIED, and Defendant's Motion for Summary Judgment (ECF 36) shall be DENIED.

A separate Order will follow.

   9/16/24                                              /S/       
Date                                                                  Matthew J. Maddox
                                                                      United States District Judge